IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

TONYA CARSWELL,                          )
                    Plaintiff,           )
                                         )
        vs.                              )        Civil Action No. 13-378
                                         )
MONUMENTAL LIFE INSURANCE CO., et al.,   )
                    Defendants.          )

MEMORANDUM OPINION AND ORDER

Plaintiff, Tonya Carswell, proceeding pro se, brings this action against Defendants, her former employer, Monumental Life Insurance Company (Monumental),[1] and District Manager Ronald Ehalt, alleging claims of racial discrimination, sexual discrimination, hostile work environment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 (Title VII), and the Pennsylvania Human Relations Act, 43 P.S. §§ 951-63 (PHRA), arising out of their alleged creation and toleration of a hostile work environment and acts of retaliation, ultimately culminating in her constructive discharge from employment as a Monumental Career Agent on August 14, 2012.

Currently pending before the Court for disposition is a motion for summary judgment, filed by Defendants. For the reasons that follow, the motion will be granted with respect to Plaintiff's claims of sex and race discrimination and denied with respect to her claims of sexual and racial hostile work environment, constructive discharge and retaliation. In addition, the motion will be denied with respect to her claims against Ehalt under the PHRA.

---

[1] Plaintiff refers to the corporate defendant as "Monumental/Transamerica Life Insurance" but it states that its proper name is "Monumental Life Insurance Company." (ECF No. 40 at 1 n.1.) As noted below, however, some of the documents in the record are on the letterhead of "Transamerica Life Insurance Company" and "Transamerica Agency Network." See also n.4, infra.

<u>Facts</u>

Prior to setting for the relevant facts in this case, the Court makes the following observations. On April 14, 2014, Defendants submitted a Statement of Undisputed Facts in support of their motion for summary judgment (ECF No. 41). On a motion for summary judgment, a court must "view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." <u>Bouriez v. Carnegie Mellon Univ.</u>, 585 F.3d 765, 770 (3d Cir. 2009) (citation omitted). Despite this legal principal, Defendants have not presented the facts in the light most favorable to Plaintiff as the nonmoving party, or even in a neutral manner. Rather, they have engaged in tactics such as: referring to her "allegations" even when she has proffered evidence in support of them; "paraphrasing" a document that stated that she would be terminated if she failed to meet a sales quota to say that she only "risked termination"; omitting from the incident in which Plaintiff was criticized for dressing casually the fact that she was not working at the time but only stopped by the office to pick up a form; reordering events so that the chronological sequence is obscured and there is no "build up" of incidents leading to Plaintiff's resignation; relying on an internal EEOC document which she denied receiving or having been made aware of to characterize her claims as meritless; omitting certain facts that would support Plaintiff's claims, including her testimony that she <u>did</u> report harassment to a senior company official prior to resigning; and attempting to limit Plaintiff's claims by having her confirm at her deposition that one incident was the "sole basis" for a certain claim even when the record is clear that other events would support it and by noting that she did not include every incident with Ehalt in her internal complaint (as though she failed to meet some complete exhaustion requirement) and ignoring her testimony that she intended to provide more details during the investigation, but was not given the opportunity.

On May 29, 2014, Plaintiff filed her submissions in response to Defendants' motion. Defendants correctly note that, contrary to Local Rule 56C, Plaintiff did not submit a responsive concise statement with numbered paragraphs and citations to the record to deny their statements. Nevertheless, the Court will not "deem admitted" all of Defendants' statements as they suggest is the proper course under Local Rule 56E, for several reasons. First, the Rule itself states that:

> Alleged material facts set forth in the moving party's Concise Statement of Material Facts or in the opposing party's Responsive Concise Statement, which are claimed to be undisputed, will for the purpose of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party.

LCvR 56E. As Defendants know, Plaintiff has submitted her own Statements of Undisputed Genuine Issues of Material Facts in support of her opposition (ECF No. 45). Thus, the Rule itself recognizes that the manner in which Plaintiff proceeded is acceptable.

Plaintiff's statements are not a model of clarity and she often combines facts with legal arguments and conclusions. Nevertheless, Plaintiff is proceeding pro se and the Court is required to liberally construe pro se filings, Haines v. Kerner, 404 U.S. 519, 520 (1972). More specifically, "the purpose of certain district court local rules pertaining to motions is the facilitation of the court's disposition of the motions, not punishment." Boswell v. Eoon, 452 F. App'x 107, 111 (3d Cir. 2011) (citation omitted). "Permitting the non-movant to rely on its briefing and evidentiary submissions to dispute the movant's 56.1 statement is consistent with the requirement at summary judgment that federal courts 'view the facts in the light most favorable to the non-moving party.'" Id. at 112 (quoting Jakimas v. Hoffmann-La Roche, Inc., 485 F.3d 770, 777 (3d Cir. 2007)). Plaintiff's averments are supported by her brief and appendix of materials, even if she does not always link them properly.

On June 11, 2014, Defendants submitted a Counterstatement to Plaintiff's Statements

(ECF No. 48) with numbered paragraphs and citations to the record, tracking Plaintiff's facts and responding thereto. Thus, as a whole the record does meet the requirements of the Local Rules and Federal Rule of Civil Procedure 56.

However, many of Defendants' responses "deny" Plaintiff's statements on the sole ground that she has cited no record support for them, a hyper technical argument that appears designed to take advantage of Plaintiff's pro se status. In fact, every statement Plaintiff makes about incidents that occurred at Monumental was previously made in one of a very few documents in the record: her internal complaint, her letter of resignation, and her EEOC charge. Defendants cannot contend that they are unaware of these documents.

In addition, Defendants' denials are particularly troubling when the record evidence that would either confirm or controvert Plaintiff's statement would naturally be within the possession of the company, rather than in the possession of a former employee. For example: Plaintiff states that she was twice named "top agent"; she asserts that she was the only black female agent in the Pittsburgh office and that there was one other (white) female agent and one black male agent; she indicates that she met her Minimum Placement Standard in July 2012 (prior to the August 15, 2012 deadline) and was not fired; and she notes that the threat of immediate termination in the April 2, 2012 letter for failure to meet her sales quota was not consistent with Monumental's practices. Because Monumental could easily have denied these averments, if they were untrue,[2] with record evidence in its possession but has not done so, it is a fair inference that Plaintiff's statements are in fact true. In any event, the inference will be drawn in Plaintiff's favor for purposes of the pending motion.

---

[2] Monumental knows how to do this. See, e.g., ECF No. 48 ¶ 24 (responding to Plaintiff's statement that she was "forced to remain off work until January 2012" with the "further response" that her doctor did not release her to work full time until January 2, 2012 and the doctor's note in support of this fact).

Bearing all of these considerations in mind, the Court has not taken either version of the facts as presented by the parties, but has culled the facts from the record and placed them in chronological order. The following are the relevant material facts, with all inferences drawn in Plaintiff's favor as the nonmoving party.

Monumental is engaged in the business of selling and servicing multiple lines of insurance products, including life, health, and property and casualty within various nationwide sales regions. (Ehalt Decl. ¶ 2.)[3] Monumental merged with Transamerica Agency Network in 2012. (ECF No. 45 ¶ 1.)[4] Each sales region is composed of numerous district offices. (Ehalt Decl. ¶ 2.) Each district office employs a single District Manager, one or more Sales Managers, one or more Agency Coordinators and multiple Sales Agents. (Id.) All of these positions are considered "field" positions as opposed to corporate or home office positions. (Id.)

Ronald Ehalt began working for Monumental in 1993 and is still employed by the Company. (Ehalt Decl. ¶ 3.) On January 1, 2004, Ehalt was promoted to the position of Regional Vice President. (Id.) Effective January 1, 2010, Ehalt became responsible for the offices in Region 3, which included Monumental's Pittsburgh office. (Id.) Effective July 1, 2011, Monumental repositioned Ehalt to the position of District Manager of the Pittsburgh office based on the pending retirement of the then District Manager, Vincent Crimbly. (Ehalt Decl. ¶ 4.)

Plaintiff began working for Monumental as a contract agent, also known as a

---

[3] Defs.' Concise Statement (ECF No. 41) Ex. A.

[4] Monumental denies this statement on the grounds that Plaintiff provides no evidentiary support for it. (ECF No. 48 ¶ 1.) However, Transamerica's website explicitly states: "We are Transamerica Agency Network, Inc.—formed by joining Monumental Life agents with Life Investors Financial Group, Inc." http://www.transamericaagencynetwork.com. See also Pl.'s App. (ECF No. 46-1) at 49 (September 6, 2012 letter to Plaintiff from the "Transamerica Employee Service Center" informing her that she was overpaid on her final paycheck).

Monumental Sales Associate, on or about March 6, 2010. (Carswell Dep. at 48.)[5]

Crimbly hired her as a Monumental Career Agent, assigned to the Pittsburgh office, on August

16, 2010. (Carswell Dep. at 49; Compl. ¶¶ 13-14.)  Her direct supervisor was Sales Manager

Rafal Kolankowski and Crimbly, as District Manager of the Pittsburgh office, was her second

level supervisor.  Crimbly testified that:

> This young lady was a young widowed mother trying to raise five kids
> who had the knowledge and pain of losing a husband.  Marketing wise, she was a
> perfect fit because I had a large book of business that I believe some or many
> customers would feel more comfortable dealing with a woman.  And I felt she
> would be more comfortable in selling and explaining life insurance having the
> empathy of living through losing a husband with five kids that didn't have enough
> life insurance.  She was a perfect hire in my mind because she served the market
> that I had to deal with.  Young, black, female.  That's a market.  A combination of
> markets.
>
> She was young, she worked hard.  Sure she made mistakes.  But it takes
> years, in my opinion, to train and develop and get to a solid career image. They
> just don't happen overnight.  She listened to what I told her.  She did what I told
> her.  That's what I recall during my employment with Monumental.

(Crimbly Dep. at 35-36.)[6]

As a Career Agent, she understood that her employment could be terminated "either by

[herself], at any time, or by the Company, at any time, with or without cause, and with or without

notice." (Carswell Dep. at 69-70; Carswell Dep. Ex. 8.[7])  Upon hire, Monumental provided

Plaintiff with one of its own prearranged "agencies," or books of business/customers. (Carswell

Dep. at 51-52.)  She was originally assigned to Agency E112. (Carswell Dep. at 51-52.)  Plaintiff

was never disciplined during her employment with Monumental. (Carswell Dep. at 72.)  On two

---

[5] Unless otherwise noted, all excerpts from Plaintiff's deposition are contained in ECF No. 41
Ex. B.
[6] ECF No. 46-1 at 59-60.
[7] All cited exhibits from Plaintiff's deposition are contained in ECF No. 41 Ex. C.

occasions, she was named "top agent." (ECF No. 45 ¶ 17.)[8] She resigned her employment with

Monumental on August 14, 2012. (Carswell Dep. at 171; Carswell Dep. Ex. 17.)

Monumental has a Workplace Harassment Policy and Procedures which provides in part

that "Monumental maintains a policy of zero tolerance prohibiting unlawful harassment with

regard to an employee's race, color, religion, gender … or any other status protected by federal,

state, or local equal employment opportunity laws." (Carswell Dep. at 59; Carswell Dep. Ex. 6.)

The policy defines workplace harassment as:

> *unwelcome* conduct, whether verbal, visual, or physical, that is based upon an
> individual's protected class, such as race, color, gender, etc., such action results in
> a tangible employment action, or that is severe or pervasive enough that it
> unreasonably interferes with an individual's work performance or otherwise
> creates an intimidating, coercive, hostile or offensive working environment.

(Carswell Dep. Ex. 6 at 1.) The policy provides that, if reporting an incident to an employee's

district, "bristrict"[9] or branch manager would be uncomfortable or otherwise ineffective, the

employee should report the incident directly to the Area Manger or Regional Vice President

overseeing his or her district, "bristrict" or Branch Office, the Field Human Resources or one of

several listed administrative office contacts. (Id. at 2.) "Supervisors and other management

officials who witness or become aware of any incident(s) of workplace harassment must

promptly report such incident(s) to one of the above-listed parties." (Id.)

Plaintiff acknowledged receipt of the Workplace Harassment Policy and Procedures as an

employee of Monumental. (Carswell Dep. at 58-59; Carswell Dep. Exs. 6, 7.) She also

acknowledged that Monumental's Workplace Harassment Policy and Procedures contained a

---

[8] Defendants deny this averment on the grounds that she provides no evidentiary support for it.
(ECF No. 48 ¶ 17.) This response elevates form over substance and, as noted above,
Monumental undoubtedly has within its records the information to either support or refute
Plaintiff's averment. Therefore, for purposes of this motion, her averment will be taken as true.
[9] This term is Monumental's.

complaint procedure, whereby she could report any complaint of discrimination or harassment occurring in the workplace. (Carswell Dep. at 58-61; Carswell Dep. Exs. 6, 7.)

Plaintiff signed and agreed to the terms of an Agent's Agreement with Monumental on August 13, 2010, when she was hired as a Career Agent. (Carswell Dep. at 66-68; Carswell Dep. Ex. 8.) Monumental notes that the Agent's Agreement stated that she had "no vested interest in any agency or territory to which [she] may be assigned, or the policies in force on such agency, now or in the future," although Plaintiff indicated that she did not recall being aware of this at the time. (Carswell Dep. at 68-69; Carswell Dep. Ex. 8.) Monumental also notes that it reserved "the right to assign [her] to another agency; [and] to modify or alter the boundaries of the agency…." (Carswell Dep. at 68; Carswell Dep. Ex. 8.) Nevertheless, as explained below, Plaintiff has asserted that Ehalt told her that she would reacquire her agency when she returned from medical leave, but then reneged on this promise.

<u>Plaintiff's Medical Leave of Absence</u>

On July 19, 2011 (shortly after Ehalt replaced Crimbly as the District Manager for the Pittsburgh office), Plaintiff went on a medical leave of absence as a result of injuries she suffered in a car accident on April 4, 2011. (Carswell Dep. at 85-87.) Her doctor's note requested that she remain off work until a follow-up appointment on August 15, 2011. (ECF No. 46-1 at 12.) Within a month of the time Plaintiff left on a medical leave of absence, Ehalt gave her clients to Barbara Olsen-Douglas, a recently hired white woman. (ECF No. 46-1 at 18.) The office consisted of eleven agents, nine men (of which only one was a black man, Fernando Glenn) and two women, herself and Olsen-Douglas. (ECF No. 45 ¶¶ 37, 62; Carswell Dep. at 124.) Plaintiff attempted to come back to work in October but Ehalt told her that there was no agency for her because she had been gone too long. (ECF No. 45 ¶¶ 9, 24.)

On November 23, 2011, Plaintiff's physician wrote a note indicating that she could return to work, driving and using a laptop computer, for four hours a day, five days a week beginning December 1, 2011. Gary Barnes, the Senior Human Resources Professional Advisor, told her that she had to obtain a doctor's release without restrictions of driving or using a computer, but she was still not allowed to return to work at that time. She testified that, after she obtained a doctor's note satisfying Barnes' instructions, he changed the rules by insisting that she had to be released to work full time before she could be reinstated. (Carswell Dep. at 107-08; ECF No. 46-1 at 13.)[10] See also Kolankowski Dep. at 16.[11]

On December 21, 2011, Plaintiff submitted a note from her doctor indicating that she could return to work full time, without restrictions, on January 2, 2012, and she was allowed to return to work. (Carswell Dep. at 108; Carswell Dep. Ex. 12.) Monumental contends that it granted Plaintiff all of the leave that she had requested, but Plaintiff's testimony makes clear that she did not "request" more unpaid leave. Rather, she wanted to return to work but was not permitted to do so. (Carswell Dep. at 101, 107.) Plaintiff was assigned to Agency 2877 after she returned from her medical leave of absence. (Carswell Dep. at 115.)

Plaintiff Returns to Work

Plaintiff has indicated that, when she returned from medical leave on January 3, 2012, Ehalt was extremely hostile to her: she was not given a desk or mailbox, he told her that if another agent had not left she would be out of a job and he told her to ignore whatever Gary Barnes from HR had said to her. She asserts that Ehalt told her that she was penalized for the polices that she had written that lapsed while she was away, but she would receive no credit or commission for policies that did not lapse and they were not transferred back to her, despite

---

[10] Defendants' summary of Plaintiff's testimony ignores this sequence of events.
[11] ECF No. 46-1 at 42.

Ehalt's prior indication that this would occur. (ECF No. 46-1 at 18, 22.) She has also testified

that, while she was on medical leave, her laptop was stolen from her home (Carswell Dep. at

101) and she states that, although she faxed a copy of the police report to the company as

instructed, Ehalt would not provide her with a laptop. (ECF No. 45 ¶ 23.)

Martin Luther King Day

January 16, 2012 was Martin Luther King Day for that year. Plaintiff testified that she

learned that Ehalt had told the office administrator, Linda Sandusky, not to distribute a

memorandum to office employees regarding Martin Luther King Day. (Carswell Dep. 125-27.)

Sandusky testified that, to her knowledge, Martin Luther King Day is a holiday for Monumental

employees and she stated that Ehalt told her not to tell anyone about it. (Sandusky Dep. at 22:8-

25.)[12]

Defendants state that Martin Luther King Day was not a designated holiday for field

service employees. (Ehalt Decl. ¶ 5.) As a Career Agent in the Pittsburgh office, Carswell was a

field service employee. (Ehalt Decl. ¶ 2.) They point out that Sandusky admitted that there were

some differences between home office employees and field service employees but she did not

know what they were. (Sandusky Dep. at 32-33.)[13] Nevertheless, Sandusky testified that Ehalt

told her not to tell anybody that it was a day off. (Sandusky Dep. at 22:21-23.)

Ehalt Comment re Plaintiff and Crimbly

Around this time, Plaintiff learned Ehalt had asked around the office if she obtained her

job by having a sexual relationship with Crimbly. (Carswell Dep. at 140; Carswell Dep. Ex. 13.)

Plaintiff states that Sandusky informed her that Ehalt had asked: "What was Vince thinking when

he hired her? Was something going on between them two? Were they involved with each other

---

[12] ECF 46-1 at 58.
[13] Defs.' Reply App. (ECF No. 49) Ex. D.

in some type of way?" (Carswell Dep. at 141-42.)  Sandusky also testified at her deposition to having heard Ehalt inquire if Plaintiff had been involved in a sexual relationship with Crimbly in order to obtain her job (Sandusky Dep. at 12:4-16)[14] and submitted an affidavit to this effect (ECF No. 46-1 at 53).[15]  She also testified that John Mamakos (who became Plaintiff's direct supervisor after Kolankowski left) later told her that he heard the statement as well.  (Sandusky Dep. at 28.)[16]  See also Meighan Aff. at 1.[17]

Other Comments by Ehalt

Plaintiff testified that Ehalt insinuated that there were certain areas or neighborhoods that he would not waste time in because there was no money to be made there. (Carswell Dep. at 133, 137.)  She interpreted this alleged comment to be racially motivated.  (Carswell Dep. at 134.)  Monumental contends that Plaintiff admitted that Ehalt did not specifically mention or identify the race of any of the neighborhoods. (Carswell Dep. at 134.)  However, Kolankowski testified that, although Ehalt never directly said that he did not like black people, certain statements and actions on his part supported such a conclusion.  (Kolankowski Dep. at 19.)[18] When asked for an example, he said:

> Well, Monumental Life has a lot of business in the inner city of Pittsburgh, and I guess you could say we were told that we don't want that type of business with the way Monumental and TransAmerica is going and these type of neighborhoods were mostly Afro-American neighborhoods.  And that we don't want to deal with these types of people.

---

[14] ECF No. 46-1 at 17.

[15] Defendants note that Sandusky acknowledged at one point in her deposition that Ehalt did not use the words "sexual relationship" (Sandusky Dep. at 26-27) (ECF No. 49 Ex. D), but at page 17 of her deposition and in her affidavit, she did use this phrase.  And as noted, William Meighan also submitted an affidavit testifying to the same fact.  Defendants ignore this evidence.

[16] ECF No. 49 Ex. D.

[17] ECF No. 46-1 at 55.

[18] ECF No. 46-1 at 25.

(Id. at 20.)[19]  In addition, Crimbly testified that the company – and specifically Ehalt – wanted to terminate the only other African American sales agent in the Pittsburgh office, Fernando Glenn, but he (Crimbly) fought against it and was able to overturn the decision to terminate Glenn. (Crimbly Dep. at 24-25, 33-34.)[20]

Plaintiff also testified that Mamakos informed her that Ehalt had said that her agency did not "fit" her because it "consists of middle-class white people."  Ehalt wanted to take this agency from her and give it to another agent.  (Carswell Dep. at 139.)

Plaintiff's Internal Complaint

On February 22, 2012, Plaintiff filed an internal complaint with Monumental's Field Human Resources Department.  (Carswell Dep. at 118; Carswell Dep. Ex. 13.)  In this internal complaint, she stated that:

> Mr. Ehalt has inflicted my emotional stress mixed with discrimination and intimidation.  I feel that I am discriminated against first because Vince Crimbly hired me, second because I'm black and third, because I'm a woman.  Ron Ehalt stated to me on my first day back to work had Dan [Dinardo] … not resigned the week before I came back to work, I would not have a position there, but the whole month of January till present he's conducting interviews to our fully staff[ed] office.  I was replace[d] a month after I went on unpaid medical leave.  Upon my return to work, I was not welcomed.  I was totally ignored and not given any type of direction as far as where I was and what my part was as an employee until I asked out loud was I terminated? I had no mailbox and the desk I was at was no longer available to me.  I was told by Ron Ehalt to ignore everything Gary Barnes explained to me upon returning back to work as far as my status in the company because what Gary Barnes says means nothing.
>
> On Martin Luther King Holiday he made no mention that the holiday is acknowledged by our company, in fact, the office administrator was told not to give us the memo.  His action to that is very offensive and degrading and it tells me racism is still alive and well in 2012 and I will not be respected as a black woman working at Monumental Life Ins. Co. from here on out.

---

[19] ECF No. 46-1 at 26.

[20] ECF No. 46-1 at 28-31.  Defendants deny this statement, citing page 24 of Crimbly's deposition, but at page 33 he said that "both [the company] and [Ehalt] were in agreement that he should be gone."

While I was on [FMLA leave] I had no income and my life, cancer and tap policies lapsed. On Tuesday, February 14th I ask[ed] Ron if could put my application thru his laptop and he said OK. Couple minutes later he ask if the policy was for me and I said yes it's for my children and myself, he then stated that he didn't see any children. I asked if he wanted to see pictures but he said no. On Friday, February 17th I produced my children in order for him to put my application thru. He then brought me his laptop and made me put my information in myself.

Ron Ehalt accused me of having a sexual relationship with Vince Crimbly to get my job, by asking around the office, Did Vince hire me because we were sleeping together.

I don't believe Ron's apology to the office to be sincere and I'm afraid for the reasons explained above that I will continue to be treated unfairly and inappropriately because his apology did not address anything he did personally to me. He blamed his divorce as a reason for his behavior, but getting a divorce doesn't strike me as a logical reason to attack me, ignore the fact that I am in fact a black woman and it offends me and lets me know that racism is alive at my work place. He has no reason to assume or accuse me of having sex with Vince Crimbly to get my job. I have six children that I'm raising by myself because my spouse is dead, being an insurance agent permits me to be a single working mother with no conflict. I am trying my best to be a successful agent. I'm new to the business but I'm learning and I believe I can go far. I believe I can be a great asset to this company, but from where I sit, I believe Mr. Ehalt will allow his personal issues to hinder me. I don't believe he is capable of carrying out the duties and concerns for the company and I'm afraid I would have to painfully look elsewhere for employment.

I need my job because I benefit a great deal. I want my job because it's my passion and I know I can help others understand how important Insurance is because of my own personal experience. I pray I do not be targeted for more grief and unfairness because I shared this with you, and I hope I don't have to prepare for the worst.

(Carswell Dep. Ex. 13.) Thus, the internal complaint raised four issues: 1) Ehalt's actions during her medical leave and upon her return; 2) Ehalt's refusal to acknowledge the Martin Luther King holiday; 3) Ehalt's response when she asked him to allow her to apply for insurance policies for herself and her children; and 4) Ehalt's "query" as to whether she had obtained her job by having a sexual relationship with Crimbly. At her deposition, however, Plaintiff testified that she did

not list every single incident with Ehalt in her internal complaint, because she hoped that Monumental would speak to her as part of its investigation and she could get into further details, but this did not occur. (Carswell Dep. at 137, 140.)[21]

On March 7, 2012, Gary Barnes sent Plaintiff a letter stating as follows:

> We appreciate you bringing your concerns regarding Pittsburgh PA District Manager Ron Ehalt to the attention of Monumental Life's Field Human Resources. Please be advised that we have conducted an investigation into your concerns, and appropriate action has been taken based on the investigation.

(Carswell Dep. Ex. 14.) Plaintiff acknowledged receiving this letter, but testified that she was never told what "appropriate action" had been taken. (Carswell Dep. at 154-55.) Nor has Monumental indicated in this litigation what action it took. She also asserts that the only "witness" who was contacted was Ehalt. (ECF No. 45 ¶ 44.) Sandusky also testified that she was not contacted in the investigation even though she was a witness to Ehalt's actions regarding the Martin Luther King holiday incident. (Sandusky Dep. at 19, 35.)[22]

Curiously, Plaintiff has submitted into evidence a letter, dated March 16, 2012, in which Regional Vice President Michael Knotts wrote to Ehalt addressing "concerns voiced to our HR department by almost all members of your office about your 'management style.'" (ECF No. 46-1 at 6-7.) Plaintiff notes that this memo did not address the issues she raised in her internal complaint.[23]

---

[21] Defendants omit Plaintiff's testimony and argue in effect that some of the allegations she makes against Ehalt in this litigation are "unexhausted" because they were not included in her internal complaint. This is improper.

[22] ECF No. 46-1 at 57, ECF No. 49 Ex. D. Plaintiff has also submitted Monumental's position statement that it provided to the EEOC in response to her charge of discrimination, in order to refute arguments made therein (ECF No. 46-1 at 43-47). However, Monumental has not referred to this document or made the same arguments herein, so the Court will not consider it.

[23] Defendants deny this averment, but the document (the authenticity of which they do not challenge) speaks for itself. It is also noted that the memo is on the letterhead of Transamerica Agency Network.

<u>Street Walker Comment</u>

Plaintiff indicates that in March 2012, both Crimbly and her by-then former sales manager, Kolankowski, informed her that Ehalt had been saying that Plaintiff came across to him as a "street walker." (Carswell Dep. at 157, 160; Crimbly Dep. at 11,[24] 28-29[25]; Kolankowski Dep. at 8-9, 25.[26]) She has submitted affidavits from Kolankowski and Crimbly to this effect. (ECF No. 46-1 at 52, 54.) Crimbly also testified that Ehalt "was complaining about the type of business [Plaintiff] wrote, especially the mode. Actually suggested that we refuse to accept her business that would have been based on a monthly collection." (Crimbly Dep. at 22-23.)[27]

<u>Plaintiff Speaks to Knotts</u>

Omitted from Defendants' statement of facts is the crucial point that, in March 2012 (after she received the letter from Barnes telling her that "appropriate action" had been taken regarding Ehalt and after she learned that Ehalt had been referring to her as a "street walker"), Plaintiff spoke with Michael Knotts, a Regional Vice President of the company, and complained about the situation. According to Plaintiff's account of this conversation (which is the only account in the record), Knotts responded to her complaints about Ehalt by stating that if she found the situation so intolerable that she felt she had to resign, he would "keep her on payroll" until she found another job. (Carswell Dep. Ex. 17 at 4-5.)

<u>Plaintiff Speaks to the EEOC</u>

Also omitted from Defendants' account of what occurred in March is that Plaintiff spoke

---

[24] ECF No. 46-1 at 27. Defendants emphasize that Ehalt apparently made the comment in late 2010, although Plaintiff did not learn of it until March 2012, in order to make the point that Ehalt did not make any <u>new</u> harassing comments after she filed her internal complaint. Nevertheless, given the sequence of events as outlined in the text, this is a distinction without a difference.
[25] ECF No. 41 Ex. D.
[26] ECF No. 46-1 at 9-11. Kolankowski stated that his last day with Monumental was March 1, 2012.
[27] ECF No. 46-1 at 15-16.

to someone at the Equal Employment Opportunity Commission (EEOC). As she describes the sequence of events, she initiated contact with the EEOC in March and Monumental was given ten days in which to resolve the issues informally, then two months in which to engage in mediation, but Monumental refused to do so and the charge of discrimination was formally signed on June 7, 2012. (ECF No. 45 ¶¶ 35, 41, 58-60.)[28]

April 2, 2012 Letter

On April 2, 2012, Michael Abdella, a Regional Vice President, sent Plaintiff a letter (on the letterhead of Transamerica Life Insurance Company) stating as follows:

> Earlier this year Monumental Life agents received information regarding the Agent Minimum Placement Standards that are in effect for 2011. As explained in that information, the annual Minimum Placement Standard for 2011 is $30,000 in net placements.
>
> You are receiving this letter because at this time you have not met the $30,000 Minimum Placement Standard for the twelve-month Minimum Placement Period of 8/16/2011 through 8/15/2012. Your actual net placements through 3/31/2012 and the net placement amount to meet by 8/15/2012 are printed below. You will want to work with the management team in your office to determine what you need to do to reach the $30,000 Minimum Placement Standard by 8/15/2012.
>
> Please be advised that agents who have not met their Minimum Placement Standard will be terminated on the first or sixteenth day of the month (whichever comes first) immediately following the end of their Minimum Placement Period.
>
> **Net placements through 3/31/2012: $14,253**
>
> **Net placements amount to meet by 8/15/2012: $18,750**
>
> **Net placements needed before 8/15/2012: $4,497**

(Carswell Dep. Ex. 16.) Plaintiff received this letter. (Carswell Dep. at 167-68.)[29]

---

[28] Plaintiff states that she "filed" the charge in March. This may not be technically accurate. Defendants deny the averments on the ground that she provides no record support for them. Again, this is a hyper technical argument and Monumental is well aware of when Plaintiff contacted the EEOC.

[29] As Plaintiff observes (ECF No. 45 ¶ 34), Defendants' concise statement mollifies the letter by

Defendants state that this letter was sent to all employees who had not yet met their Minimum Placement Standard (sales quota) for the year reminding them of their obligation to meet the standard. (Ehalt Decl. ¶ 6.) Defendants have omitted the fact that Plaintiff was on medical leave from July 19, 2011 until January 2, 2013, or approximately four and a half months of the twelve-month period.

Defendants note that Plaintiff admitted that as of April 2, 2012, she had not yet met her Minimum Placement Standard for the year, although she stated that she "wasn't too far from it." (Carswell Dep. at 168-69; Carswell Dep. Ex. 16.)[30] Plaintiff testified that immediate termination for failing to make an annual quota was not company policy. (Carswell Dep. at 169.)[31] She also indicates that she met and exceeded her Minimum Placement Standard in July and was not terminated. (ECF No. 45 ¶ 46.)[32] Her contention is that, after she met her quota and could not be terminated on that basis, the work environment became extremely hostile.

Plaintiff's EEOC Charge

On June 7, 2012, Plaintiff formally filed a Charge of Discrimination (No. 533-2012-00671) with the EEOC against Monumental alleging race and sex discrimination. The charge described the incidents surrounding her medical leave (including Ehalt's comment that she would not have been allowed to return if another agent had not left, his comment that he had to

---

paraphrasing it to say that if she did not meet her quota she "risked" termination, when the letter actually said Plaintiff "will be terminated."

[30] Plaintiff has also submitted a document with the title "Placement & Increase Bonus Tracker" which appears to show numbers for all members of the Pittsburgh office as of April 27, 2012. (ECF No. 46-1 at 61.) Defendants contend that this document does not constitute "record evidence" but do not explain what this means.

[31] Plaintiff asked this question of Kolankowski at page 16 of his deposition (ECF No. 46-1 at 42), but Kolankowski's answer does not appear in the record. Nevertheless, Plaintiff can testify from her own knowledge about Monumental's practices in this respect.

[32] In a supreme act of elevating form over substance, Defendants "deny" this statement as unsupported, but Monumental obviously knows whether or not it is true.

fill her agency because she was "gone too long" even though he filled it only one month after she left), Ehalt's comment about her relationship with Crimbly and the "street walker" comment, and Ehalt's comment that her agency did not "fit" her because it consisted of middle-class white people. (Carswell Dep. at 161; Carswell Dep. Ex. 15.) The EEOC investigated her Charge and sent her a Notice of Right to Sue on December 17, 2012 in which it indicated that it was "unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge." (ECF No. 46-1 at 24.)[33]

<u>July and August 2012 Incidents with Mamakos</u>

Plaintiff states that on Friday, July 27, 2012, she was at a meeting that lasted longer than expected and she did not call off a meeting at the office in adequate time. Her sales manager, Mamakos, was furious with her, and her penalty was that she had to report to the office at 9:00 a.m. the following Monday. Later that same day, the transmission failed on her car. (Carswell Dep. at 178-79; Carswell Dep. Ex. 17.)

The following Monday, July 30, she was on her way to the office when Mamakos texted her to say "Tonya, I need your full report now. Also, I have to push our meeting back to 10am, and being there isn't an option for me." She sent her report in and informed Mamakos that she had an 11:00 a.m. sales appointment in Burgettstown, which was more than 45 minutes away and

---

[33] Defendants contend that the EEOC determined that she had suffered no harm primarily because Monumental had responded promptly and effectively to her February 2012 internal complaint. However, their support for this assertion is an "Investigative Report/Pre-Determination Contact," which is apparently an internal (and unsigned) EEOC document, and Plaintiff denied receiving it or being told that further investigation would not likely lead to a finding of a violation. (Carswell Dep. at 198-99; Carswell Dep. Ex. 19.) Defendants' submission is inappropriate and their omission of Plaintiff's denial of having received the document or having been made aware of its contents is improper. <u>See, e.g.</u>, <u>Berry v. Georgetown Inn, Ltd.</u>, 2010 WL 608076, at *2 (W.D. Pa. Feb. 18, 2010); <u>Kirby v. J.C. Penney Corp.</u>, 2009 WL 3572494, at *3 (W.D. Pa. Oct. 26, 2009).

he told her to delay or reschedule that meeting.  She arrived at the office at 10:00 a.m. but Mamakos kept saying he needed 10 minutes, which turned into 30.  He then met with her and decided to accompany her on her sales call.  (Carswell Dep. Ex. 17.)  She testified that Mamakos appeared not to believe she really had an appointment and that is why he went with her on the spur of the moment, which was not standard procedure.  (Carswell Dep. at 180-81.)

That evening, along with texting Mamakos her report, Plaintiff asked him if he could assist her in getting to a sales call the following evening (that is, July 31) at 7:00 p.m. because her car was in the shop.  Mamakos did not respond to her message.  Then on August 1, 2012 at 8:30 a.m., he called her to ask for a report and asked if the text she sent him two days before was really meant for him and then said he would not have been able to go to a meeting at 7:00 a.m. anyway.  (Carswell Dep. Ex. 17; Carswell Dep. at 177-78.)[34]

On August 3, 2012,[35] Plaintiff checked twice with Mamakos about meeting with him to go over a weekly report, first at 11:30 a.m. and then at 1:30 p.m., but he was not ready.  She told him that she was going to lunch with a male office employee, James Contino.  Mamakos asked her to call from the restaurant in case he wanted her to bring something back, but when she did he responded "No thanks.  I'll pass."  When she and Contino returned to the office, Mamakos:

> immediately starts screaming and hollering at [Contino] and myself and he screams at [Contino], "Why did you take her up there?  Why did you take her up there?  And before [Contino] can answer him, he told him to get the F out of his face and get the F out of his office.

---

[34] In Defendants' version of this incident, Mamakos simply misunderstands that the message was meant for him and the time of the meeting, but it is clear from Plaintiff's testimony that she believed that Mamakos understood the message but deliberately pretended not to in order to give her a "hard time," that is, to harass her.

[35] Defendants refer to this incident as occurring on August 8, 2012, but both Plaintiff's deposition (which they cite) and her letter of resignation give the date as August 3, 2012.  Although this could be a simple mistake, the Court notes that Defendants recite that the dress code incident (which did take place on August 8) occurred "on or about the same day" as the restaurant incident, thereby implying that Plaintiff was working on August 8, which is not true.

> And then he says to me, you know, "You have to be … considerate of other people, Tonya," and I didn't understand why he made that comment, but I had to remind him that I came to his office on two occasions to do the report; and he said that, you know, his time is valuable, Fridays is his days, and he wants to be with his wife and I need to be considerate of him.
>
> And like I said, I reminded him, "I came to your office on two occasions, 11:30 and 1:30, to do this report, and you weren't ready, so I went to lunch."

(Carswell Dep. at 173-74.) Mamakos apologized to Contino, but not to Plaintiff, and Ehalt stood by laughing. (Carswell Dep. Ex. 17 at 3.)

The Dress Code Incident

On August 8, 2012, Plaintiff stopped by the office to pick up some papers while wearing a pair of jeans and a halter top. She was not working in the office at that time, but she needed the papers for a meeting later that day. (Carswell Dep. at 184.) She points out that no one said anything to her at the time about how she was dressed and that the office administrator was permitted to work her full shift in the office dressed down, with flip flops and Capri pants, and the trainer had on a halter top, but no one admonished them regarding the dress code. (ECF No. 45 ¶ 54; Carswell Dep. at 185-86.)[36]

On August 10, 2012, Mamakos provided her with a copy of the dress code, and Ehalt reminded her that during business hours she needed to wear professional clothing. (Carswell Dep. at 184.) Ehalt also told her that, the next time she needed anything from the office when she was not working, she was to call the office and someone would bring down what she needed. (Carswell Dep. Ex. 17 at 5.)[37] Defendants have not addressed Ehalt's comment.

---

[36] As noted above, Defendants omit the fact that Plaintiff was not working in the office on August 8. Monumental argues that Plaintiff admitted that she does not know if any other staff members were cited for dress code violations that day, but it has not affirmatively represented that they were.

[37] Defendants note that Plaintiff was not disciplined for this incident. (Carswell Dep. at 72, 185.)

<u>Plaintiff's Resignation</u>

On August 14, 2012, Plaintiff submitted a letter of resignation, addressed to Mamakos, Ehalt, Abdella, Barnes and Knotts, resigning her employment with Monumental. The letter was written on the letterhead of Transamerica Agency Network. (Carswell Dep. at 171-72; Carswell Dep. Ex. 17.) In the letter, she recounted: Ehalt's actions during her medical leave and upon her return, the "street walker" comment, the accusation that she obtained her job by having a sexual relationship with Crimbly, the incidents with Mamakos at the end of July and beginning of August, and the dress code incident. She concluded as follows:

> In closing, I must say, I know I'm being harassed and Ron is retaliating against me because of the complaint I filed against him for violating me as a woman and as a black woman. To my analysis, these unfair inappropriate actions will continue and I am not equipped to deal with the stresses, frustration, and the pressures that come along with being an agent on top of being picked on and my work environment made very uncomfortable and hostile for personal reasons.

> I really like this job and I love what I do, but I'm not permitted to do what I love because Ron Ehalt doesn't like me and John [Mamakos] is abusing his position. John and Ron are teaming [up] against [me] and it's very inappropriate[;] as stated earlier, this job comes with stresses and frustrations, and I can handle that, but a hostile work environment, I can not handle. Therefore, I have no other choice but to resign.

> P.S. In [M]arch 2012, I had a conversation with Michael Knotts concerning the outcome of Ron Ehalt violating me. In this conversation I requested Ron to be removed from the Pittsburgh office until I find other employment. The company decided although Ron violated me he would remain employed with this company. Michael Knotts offered to keep me on payroll until I find other employment[;] I'm now taking Michael up on that offer. I tried to move forward by focusing on becoming a successful agent by providing excellent customer service and at the same time provide a healthy income for myself to take care of my family, but Ron won't allow me to do that.

(Carswell Dep. Ex. 17 at 4-5.)

Defendants contend that, prior to submitting her resignation letter, Plaintiff did not

---

This is irrelevant, because the incident forms part of Plaintiff's hostile work environment claim, not a separate adverse employment action.

discuss with anyone at Monumental that she was considering resigning and did not provide Mamakos, Ehalt, Abdella, Barnes or Knotts an opportunity to resolve her perceived concerns of a hostile work environment before she resigned. (Carswell Dep. at 186-88.) However, she testified that she spoke to Knotts in March (Carswell Dep. at 187) and her letter includes this information. Defendants have omitted this crucial fact.

<u>Unemployment Compensation</u>

After she resigned, Plaintiff applied for unemployment compensation benefits. (Carswell Dep. at 199-200.) Monumental opposed her claim for unemployment compensation benefits and her application was denied on October 3, 2012. (Carswell Dep. at 194-95, 200; ECF No. 46-1 at 8.)

<u>Inability to Gain Employment</u>

In her brief, Plaintiff argues that after she left Monumental, she was unable to gain employment as an insurance agent on two occasions. (ECF No. 46 at 3.) Defendants respond that, at her deposition, she testified that she spoke with Lincoln Insurance, but was unable to gain employment there because Lincoln sold Monumental products and Monumental had canceled her appointment to sell its products. She further testified that she spoke with another company but she was unable to take the job because she did not have a reliable vehicle or money to have her car fixed. (Carswell Dep. at 209-10.)[38]

<u>Second EEOC Charge</u>

On October 12, 2012, Plaintiff filed a second charge of discrimination with the EEOC, alleging race, sex and retaliation discrimination. (Carswell Dep. at 199.) She recited the incidents with Mamakos that occurred in late July and early August, referred to Ehalt's "street

---

[38] ECF No. 49 Ex. A.

walker" comment and questioning of whether she obtained her job by having a sexual relationship with Crimbly, noted Monumental's opposition to her unemployment compensation claim, and noted that Ehalt had stated that the individual policies she wrote that did not lapse while she was on medical leave would be transferred back to her upon her return but they were not. (ECF No. 15-1, Wilhelm Decl. Ex. 1.)

Procedural History

Plaintiff filed this action on March 15, 2013. The complaint alleges claims of sex and race discrimination, sexual and racial hostile work environment, constructive discharge and retaliation, in violation of Title VII and the PHRA. The complaint also mentioned the Equal Pay Act, but pursuant to an order of Court entered on September 11, 2013, Defendants' motion to dismiss this claim was granted (as well as any claims for individual liability against Ehalt under Title VII, as such claims are not permitted).

On April 14, 2014, Defendants filed a motion for summary judgment. On May 29, 2014, Plaintiff filed her brief in opposition (ECF No. 46). On June 11, 2014, Defendants filed a reply brief (ECF No. 47).

Standard of Review

As amended effective December 1, 2010, the Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates

the absence of a genuine issue of material fact. Once that burden has been met, the non moving

party must set forth "specific facts showing that there is a genuine issue for trial" or the factual

record will be taken as presented by the moving party and judgment will be entered as a matter

of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An

issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In following this directive, a court must take the facts in the light most favorable to the

non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's

favor. Hugh v. Butler County Family YMCA, 418 F.3d 265, 266 (3d Cir. 2005); Doe v. County

of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001). As noted above, the Court is required to

liberally construe pro se filings, Haines v. Kerner, 404 U.S. 519, 520 (1972).

Defendants argue that: 1) Plaintiff cannot establish a prima facie case of race or sex

discrimination because she did not suffer any adverse employment action, much less an adverse

employment action under circumstances giving rise to an inference of discrimination; 2) she

cannot establish a prima facie case of retaliation; 3) even if she could establish a prima facie case

of retaliation, she cannot satisfy her burden to establish pretext; 4) she cannot establish a claim of

hostile work environment sexual harassment; 5) she unreasonably failed to take advantage of

Monumental's workplace harassment policy and complaint procedure; and 6) she cannot

maintain an individual liability claim as to Ehalt under the PHRA because her claims against

Monumental fail.

Plaintiff responds that: 1) for purposes of her sex and race discrimination claims, she

suffered adverse employment actions when she was constructively discharged, when she was

improperly denied unemployment compensation and when she could not gain employment based

on Monumental's actions; 2) for purposes of her retaliation claim, she suffered adverse employment actions in the form of the April 2, 2012 letter threatening termination and the constructive discharge; 3) she has proffered evidence that she was on track to meet her sales quota; 4) she has established claims of hostile work environment, based not only on sex but also race; 5) she attempted to utilize Monumental's harassment policy and complaint procedure, but received no relief; and 6) she has provided evidence that Ehalt aided and abetted Monumental's discriminatory practices for purposes of the PHRA.

In their reply brief, Defendants argue that: 1) Plaintiff has not demonstrated that she was constructively discharged, she has no evidence that Monumental provided false reasons to the State regarding her application for unemployment compensation and her own testimony demonstrates that her inability to obtain employment as an insurance agent was not due to any action on the part of Monumental; 2) her retaliation claim fails because she admits that at the time she received the April 2 letter she had not met her Minimum Placement Standard and thus by definition she would have received it regardless of any protected activity she engaged in prior to that date; 3) the alleged "Placement Tracker" she submits to substantiate that she was on target to meet her Minimum Placement Standard is not record evidence; 4) she proffers no record evidence in support of her contention that "any Black Female in Plaintiff's position would have felt and done the same thing she did"; 5) she offers no evidentiary support for her claim that it was reasonable of her not to take advantage of Monumental's complaint reporting procedures; and 6) since she has failed to support her claims against Monumental, she cannot maintain claims against Ehalt for aiding and abetting discrimination in violation of the PHRA.

<u>Title VII Standards</u>

Title VII provides that it is an unlawful employment practice for an employer to

discriminate against an individual with respect to conditions of employment because of her race or gender. 42 U.S.C. § 2000e-2(a). The PHRA similarly prohibits such discrimination. 43 P.S. § 955(a). In the absence of direct evidence of discrimination, a plaintiff may establish a prima facie case of discrimination indirectly following the shifting burden analysis set forth by the Supreme Court in McDonnell Douglas v. Green, 411 U.S. 792, 802 (1973) and refined in Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252 53 (1981). Farrell v. Planters Lifesavers Co., 206 F.3d 271, 278-79 (3d Cir. 2000).

As the Court of Appeals for the Third Circuit has stated:

> The existence of a prima facie case of employment discrimination is a question of law that must be decided by the Court. It requires a showing that: (1) the plaintiff belongs to a protected class; (2) he/she was qualified for the position; (3) he/she was subject to an adverse employment action despite being qualified; and (4) under circumstances that raise an inference of discriminatory action...

Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003) (footnote and citations omitted).

If the employee presents a prima facie case of discrimination, the employer must "articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." McDonnell Douglas, 411 U.S. at 802. If the employer specifies a reason for its action, the employee must have an opportunity to prove the employer's reason for the adverse employment action was a pretext for unlawful discrimination. Id. at 804. The Court of Appeals for the Third Circuit has stated that:

> [T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder to reasonably infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext).

Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted).

Sex and Race Discrimination Claims

Defendants contend that none of the incidents which Plaintiff cites constitutes an adverse employment action. Specifically, they note that she refers to the following incidents: 1) Ehalt referred to her as a "street walker"; 2) Ehalt told the office administrator not to distribute a memo to office employees regarding the Martin Luther King holiday; 3) Ehalt indicated that there were certain areas neighborhoods that he would not waste time in because there was no money to be made there, which she believed referred to minority neighborhoods; 4) Ehalt stated that her agency "doesn't fit [her] because it consists of middle-class white people"; and 5) Ehalt asked Sandusky if Crimbly hired Plaintiff because he was involved in a sexual relationship with her.

Defendants observe that in none of these incidents did Plaintiff suffer a tangible alteration of her compensation, terms, conditions or privileges of her employment. Weston v. Commonwealth of Pa., 251 F.3d 420, 431 (3d Cir. 2001) (written reprimands which effected no material change in the terms or conditions of employee's employment were not adverse employment actions). Defendants are correct.

Plaintiff points to three additional events: 1) her constructive discharge from employment; 2) Monumental's opposition to her application for unemployment benefits; and 3) acts by Monumental which interfered with her attempts to gain employment as an insurance agent. Although these three events would meet the definition of adverse employment actions, they do not fall within the analysis for sex and race discrimination claims.

First, and as explained in detail below, under applicable Supreme Court and Third Circuit precedent, constructive discharge claims are considered to be a subset of hostile work environment claims, in that the employee is contending that the environment became so hostile that she had no choice but to resign. To treat the constructive discharge itself as an "adverse employment action" would make no sense. Moreover, it would put the employer in the

impossible position of arguing that *it* had a legitimate, nondiscriminatory reason for an *employee's* decision to resign. Plaintiff's constructive discharge claim is examined below.

Second, Plaintiff's claims relating to Monumental's opposition to her application for unemployment benefits and to its alleged acts interfering with her future employment do not arise out of her allegations of race and sex discrimination. That is, she is not alleging (and has not supported a claim) that Monumental opposed her application for unemployment benefits or interfered with her future employment prospects as contrasted with similarly situated men or white women employees. Rather, her claim is that, after she engaged in protected activity (by filing an internal complaint and a charge of discrimination with the EEOC), Monumental retaliated against her in these two respects. Therefore, these acts will be discussed below in the context of her retaliation claim.

Plaintiff's allegations do not support a claim of sex or race discrimination. Therefore, with respect to the sex and race discrimination claims, the motion for summary judgment will be granted.

Hostile Work Environment Claims

The Supreme Court has held that a plaintiff may establish a Title VII violation if she can show that discrimination based on sex created a hostile or abusive working environment. Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998). The Court of Appeals has held that a plaintiff must demonstrate that:

> (1) she suffered intentional discrimination because of her [sex]; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present.

Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006) (citations and footnotes omitted). The same standard applies under the PHRA. Weston, 251 F.3d at 425 & n.3. The same standards apply to

claim alleging a racially hostile work environment.  See Faragher, 524 U.S. at 786-87 & n.1;

Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1082 (3d Cir. 1996).

In Faragher and Burlington Industries v. Ellerth, 524 U.S. 742 (1998), the Supreme Court

held that an employer will be held vicariously liable when a supervisor's harassment culminates

in a "tangible employment action" such as firing, demotion or undesirable reassignment, but that

otherwise the employer can present a defense that it had a readily accessible and effective anti-

harassment policy and that the plaintiff unreasonably failed to avail herself of it.  The burden to

establish this defense by a preponderance of the evidence falls on the employer.  Ellerth, 524

U.S. at 765; Faragher, 524 U.S. at 807.  In Pennsylvania State Police v. Suders, 542 U.S. 129

(2004), the Court held that this two-part defense is available in a constructive discharge case if

the employer makes no official act causing the employee to suffer a tangible employment action

(such as a demotion, reduction in compensation or transfer to a position in which the employee

would face unbearable working conditions).

In this case, because Monumental took no official act causing Plaintiff to suffer a tangible

employment action, it is permitted to invoke the two-part defense that it had available an anti-

harassment policy and that Plaintiff failed to utilize it.  Monumental argues that it has such a

policy and Plaintiff actually utilized it in February 2012 to report her belief that Ehalt had

inquired about her relationship with Crimbly and Monumental investigated her complaint and

took prompt and adequate remedial action.  Yet, Monumental argues, she did not report any of

the other alleged incidents supporting her hostile work environment claim, and she provides no

reasonable basis for her failure to do so.

Monumental's argument fails for several reasons.  First, as explained above, its

presentation of the evidence does not draw all inferences in Plaintiff's favor as the nonmoving

party. Indeed, its facts are not even neutral. It has omitted the following crucial events: 1) its response to Plaintiff's internal complaint in February 2012 was a letter vaguely informing her that "appropriate action" had been taken, without telling her what this action was and she perceived no change in the situation (to the contrary, she learned shortly thereafter that Ehalt had referred to her as a "street walker"); 2) there is evidence in the record, not only from Plaintiff but also others, substantiating some of her claims against Ehalt (such as his act of referring to her as a "street walker"); 3) she did make a further complaint to Knotts in March 2012 that the situation was so intolerable that she thought she would have no choice but to resign and his response was that he would "keep her on the payroll" until she found new employment and she also initiated discussions with the EEOC; 4) in late July and early August 2012, she was subjected to harassment from Mamakos (her first level supervisor) and at least on one occasion Ehalt (her second level supervisor) joined in laughing at her about it.

In Clark v. United Parcel Service, Inc., 400 F.3d 341 (6th Cir. 2005), two women brought suit, alleging a hostile work environment at UPS created by a supervisor named Brock. They alleged that Brock told sexual jokes, placed his vibrating pager on them and asked if it "felt good," made suggestive comments and leered at them in the workplace, often in the presence of supervisors (UPS denied all of their allegations). UPS contended that it was entitled to the affirmative defense because it promulgated a sexual harassment policy and the women did not avail themselves of it until an investigator spoke to them about another matter and they revealed Brock's actions, at which point Brock was sent home and subsequently allowed to resign under threat of discharge. The court noted that employers have an affirmative duty to prevent sexual harassment by supervisors and that the duty does not end with the promulgation of a policy: "Prong one of the affirmative defense requires an inquiry that looks behind the face of a policy to

determine whether the policy was effective in practice in reasonably preventing and correcting any harassing behavior." Id. at 349 (citations omitted). The court stated that:

> While there is no exact formula for what constitutes a "reasonable" sexual harassment policy, an effective policy should at least: (1) require supervisors to report incidents of sexual harassment, see Varner v. Nat'l Super Markets, Inc., 94 F.3d 1209, 1214 (8th Cir. 1996); (2) permit both informal and formal complaints of harassment to be made, Wilson v. Tulsa Junior Coll., 164 F.3d 534, 541 (10th Cir. 1998); (3) provide a mechanism for bypassing a harassing supervisor when making a complaint, Faragher, 524 U.S. at 808, 118 S.Ct. 2275; and (4) and provide for training regarding the policy, Wilson, 164 F.3d at 541. As previously set forth, UPS's policy facially meets all of these requirements, and therefore on paper, as even the EEOC concedes in its amicus brief, UPS has a reasonable sexual harassment policy.

Id. at 349-50. However, because UPS's policy required supervisors who witnessed harassment to report it, "there is a real question as to whether the supervisors should have taken the first step towards prevention and correction by reporting these incidents to the relevant UPS personnel, as was directed by the UPS policy. Thus, whether UPS, via these employees, exercised reasonable care is a question for the factfinder." Id. at 350-51 (citations omitted). See also Petrosino v. Bell Atlantic, 385 F.3d 210, 226 (2d Cir. 2004) (company not entitled to affirmative defense based on existence of complaint hotline when–according to the plaintiff's version of events–her attempt to use it was rebuffed); Suders, 325 F.3d at 443 (plaintiff attempted to contact EEO officer on two occasions, but EEO officer never followed up, never provided form she said plaintiff needed to file and conveyed insensitive and unhelpful attitude; court found genuine issues of material fact as to whether employer exercised reasonable care to prevent or correct sexual harassment).

In this case, Monumental's policy indicates that anyone who witnesses harassment of others should report it to his or her immediate supervisor, a higher company official or the Human Resources department; provides a mechanism for bypassing a harassing supervisor when making a complaint; and directs supervisors to report incidents immediately to the Human

Resources department.  Nevertheless, the evidence indicates that several individuals were witnesses to Ehalt's query as to whether Plaintiff obtained her job by having a sexual relationship with Crimbly and his reference to her as a "street walker," yet there is no evidence that anyone reported his actions or that any response was taken when Plaintiff reported it.  The jury will have to hear the witnesses and resolve this disputed issue of material fact.

Furthermore, the record is in dispute as to what occurred when Plaintiff submitted her internal complaint.  Monumental contends that it investigated and took "appropriate action."  But Plaintiff was not interviewed, Sandusky (a witness to at least one incident) testified that she was not interviewed and Plaintiff did not see any change in the situation.  Weighing the credibility of these witnesses is a function of the trier of fact.  Accepting all disputed facts and drawing all reasonable inferences in favor of Plaintiff, the nonmoving party, she has presented evidence that she tried to avail herself of Monumental's harassment policy, but obtained no relief.

Under these circumstances, courts generally find employer responses to be adequate when the harasser is warned not to engage in the behavior, reprimanded, separated from the victim and so on.  See, e.g. Tutman v. WBBM-TV, Inc./CBS, Inc., 209 F.3d 1044, 1049 (7th Cir. 2000) (completion of investigation within two weeks resulting in letter of reprimand, sensitivity training and apology to victim was appropriate remedial action); Savino v. C.P. Hall Co., 199 F.3d 925, 930 (7th Cir. 1999) (where no corroboration of events, reprimand of harasser and warning not to harass or retaliate were sufficient).

Monumental's investigation does not resemble these examples of adequate remedial actions.  Neither she nor Sandusky was interviewed, no effort was made to separate Ehalt from her and she was given no reason to believe the harassment would not continue.  Indeed, she testified that immediately after this investigation, she learned that Ehalt had been referring to her

as a "street walker."  Weighing all disputed evidence in Plaintiff's favor and drawing all

inferences in her favor as the nonmoving party, Defendants have not demonstrated that they

would be entitled to avoid liability based on the affirmative defense.

Defendants also argue that the conduct was not severe or pervasive and that Plaintiff has

not supported her contention that it would have detrimentally affected a reasonable person in like

circumstances.  Both of these arguments are also rejected, for the reasons explained below.

Was the Conduct Severe or Pervasive?

Defendants argue that the conduct to which Plaintiff points was not pervasive or severe.

A court must look to many factors, including "the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance;

whether it unreasonably interferes with an employee's work performance."  Weston, 251 F.3d at

426 (citations omitted).  The Supreme Court has stated that: "whether an environment is 'hostile'

or 'abusive' can be determined only by looking at all the circumstances.  These may include the

frequency of the discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an

employee's work performance."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).

The Court of Appeals has held that "courts should not consider each incident of

harassment in isolation.  Rather, a court must evaluate the sum total of abuse over time."

Durham Life Ins. Co. v. Evans, 166 F.3d 139, 155 (3d Cir. 1999) (citation omitted).  In that case,

the evidence demonstrated that Dianne Evans, who had been an extremely successful life

insurance salesperson for Met Life for seventeen years, had been recruited to join Durham,

where she was promised her own office and secretary, as well as unlimited phone and mailing

costs to be paid for by Durham.  However, when new managers took over, they fired Evans'

secretary, took over her office and (at least on one occasion) grabbed her buttocks from behind and told her that she smelled good.  She was assigned numerous "lapsed books," policies that were no longer active because the policyholders had switched insurance companies, and because of the way commissions were calculated, her bonus was severely cut; no male agents received as many lapsed books.  In addition, Evans was subjected to derogatory comments, including the following: she "made too much money for a goddamn woman"; she was asked to go dancing "into the fields" with the acting general manager; she was threatened that if she tried to leave and take clients with her the company would "attach her house before she left the courtroom"; when she lost an account because promised legal assistance from the home office did not arrive, her supervisor said "What do you know about annuities, you're only a woman."  Finally, she was told that she was being moved to another office and then (after she had assembled all of her files for the move) she was told that she was not moving and she discovered that her files were gone. Id. at 145-46.

Durham argued that the court should not have considered all of these incidents together, because some of them were apparently triggered by sexual desire, some were sexually hostile some were non-sexual but gender-based, and some were facially neutral.  However, the Court of Appeals held that it would "treat the sexual misconduct and the gender-based mistreatment in this case as sex discrimination.  The facially neutral mistreatment plus the overt sex discrimination, both sexual and non-sexual, in sum constituted the hostile work environment." Id. at 148 (citations omitted).  See also Abramson v. William Paterson College of N.J., 260 F.3d 265, 276 (3d Cir. 2001) ("While the individual pieces of evidence alone may not suffice to make out the claims asserted, we must view the record as a whole picture.")

In this case, although some of the incidents may not have an overt sexual content, they

may be considered along with all of the other evidence that does suggest harassment based on gender.  This argument is rejected.

With respect to a racially hostile work environment, the Court of Appeals has noted that "while discriminatory conduct persists, violators have learned to leave the proverbial 'smoking gun' behind....  But regardless of the form that discrimination takes, the impermissible impact remains the same, and the law's prohibition remains unchanged.  'Title VII tolerates no racial discrimination, subtle or otherwise.'"  <u>Aman</u>, 85 F.3d at 1082 (quoting <u>McDonnell Douglas v. Green</u>, 411 U.S. 792, 801 (1973)).  In <u>Aman</u>, two black employees (Aman and Johnson) appealed the district court's grant of their former employer's motion for summary judgment on the basis that they had failed to demonstrate the existence of a racially hostile work environment.  They did not allege that they had been called names that were overtly racial, but instead they were referred to by what the Court of Appeals called "inherently racist remarks" such as "another one," "one of them," "that one in there," and "all of you."  The court also noted that other black employees were harassed on a daily basis by employees at Cort Furniture, who hurled insults such as "don't touch anything," and "don't steal."  The court stated that "Aman and Johnson were also subjected to apparently false accusations of favoritism, incompetence, and were made to do menial jobs.  The evidence of record shows that white employees were not treated in a similar fashion."  <u>Id.</u>

The court further stated that:

> In addition to those described above, Aman and Johnson testified to numerous other examples of harassment which, viewed in isolation, arguably may not have been motivated by racial animus.  For example, Aman alleges that her time cards were stolen, making it harder for her to perform her job.  Other employees physically snatched things from her.  Aman was falsely accused of wrongdoing on at least two occasions.  As discussed earlier, several employees, including a sales manager, ignored or refused to deal with Aman.  Johnson was informed on several occasions that Aman "had to go."  In addition, [general

manager Robert] Kurtz yelled at Aman on a daily basis, and there is conflicting evidence as to whether he yelled at any white employees at Cort Furniture. After Aman and Johnson began complaining about racial discrimination, employees were asked to keep complaint lists about Aman. Similarly, Kurtz withheld relevant financial information from Johnson and gave her orders that directly contradicted orders from the controller, Jim Newton, as well as company policy. In response to one of these occasions, Newton slammed the door to Johnson's office and yelled at her. Even though he apologized, he admitted that he had never behaved in this fashion toward anyone else.

In light of the suspicious remarks discussed above, a reasonable jury could interpret this behavior as part of a complex tapestry of discrimination when examined in conjunction with the comments made by Cort Furniture's employees and management....

... We do not imply that such acts of harassment must be accompanied by racially discriminatory statements. Indeed, we have previously held that overt racial harassment is not necessary to establish a hostile environment. All that is required is a showing that race is a substantial factor in the harassment, and that if the plaintiff had been white she would not have been treated in the same manner. Id. We simply note that the harassment of black employees, when combined with the discriminatory statements made by other Cort Furniture employees, can be viewed as making the plaintiffs' racial discrimination claim all the more compelling. This is especially true given that a reasonable jury could conclude that Cort Furniture's management was not only aware of these acts and statements, but was also a source of the harassment and comments.

Viewed in the light most favorable to the non-moving parties, Aman and Johnson not only have established a prima facie case of discrimination, but they have also provided sufficient evidence such that a reasonable jury could conclude that they were subject to intentional discrimination on a regular and pervasive basis. We conclude, therefore, that summary judgment as to Aman and Johnson's hostile environment claim should not have been granted.

Id. at 1083-84 (citation omitted).

Plaintiff has presented evidence that Monumental, acting primarily through Ehalt, Barnes and/or Mamakos: 1) made her return from medical leave difficult by changing the requirements for her to return, removing her agency and refusing to return it to her, telling her that if another agent had not left she would not have been able to return, and not providing her with a desk or a mailbox or a laptop; 2) referred to her as a "street walker"; 3) said her agency did not "fit" her

because it consisted of middle-class white people; 4) indicated that agents should not waste time in minority neighborhoods, which were referred to as "that type of business" and "these type of people"; 5) inquired whether she obtained her job by having a sexual relationship with Crimbly; 6) prevented the Martin Luther King holiday from being observed in the Pittsburgh office; 7) sent her a letter threatening immediate termination if she failed to meet a sales quota, when that was not Monumental's standard procedure; 8) made her wait for hours for a meeting, authorized her going to lunch and then criticized her for having done so; and 9) treated her differently than other employees concerning the dress code, imposing it on her when she stopped by the office for a moment to pick up a form, not imposing it on others who were working and even telling her that someone would obtain forms for her and deliver them to her outside the building if necessary. Some of these incidents have sexual overtones, some have racial overtones and some have both.

The trier of fact will have to hear the evidence and determine whether it is severe or pervasive. Finally, Defendants argue that Plaintiff has not supported her contention that the conduct would have detrimentally affected a reasonable person in like circumstances. They provide no authority for their contention that Plaintiff must have "evidence" of this factor or what form such evidence would take. The Court concludes that this question is closely tied to the issue of whether Plaintiff suffered severe or pervasive harassment, and like that question, it must also be decided by the trier of fact. Therefore, with respect to the hostile work environment claims, the motion for summary judgment will be denied.

<u>Constructive Discharge Claims</u>

Plaintiff alleges that she was constructively discharged from her employment. Defendants argue that her evidence does not meet the standard for a constructive discharge claim

and that they are entitled to the affirmative defense that they had in place an anti-harassment

policy and that she unreasonably failed to take advantage of it.

The Supreme Court has recognized that:

> Under the constructive discharge doctrine, an employee's reasonable
> decision to resign because of unendurable working conditions is assimilated to a
> formal discharge for remedial purposes.  The inquiry is objective: Did working
> conditions become so intolerable that a reasonable person in the employee's
> position would have felt compelled to resign?

Suders, 542 U.S. at 141 (citations omitted).  The Court further observed that, as compared to a

pure hostile work environment claim, "[a] hostile-environment constructive discharge claim

entails something more: A plaintiff who advances such a compound claim must show working

conditions so intolerable that a reasonable person would have felt compelled to resign."  Id. at

147 (citations omitted).

The Court of Appeals has explained that:

> "We employ an objective test to determine whether an employee can recover on a
> claim of constructive discharge .... [and must therefore] determine whether a
> reasonable jury could find that the [employer] permitted conditions so unpleasant
> or difficult that a reasonable person would have felt compelled to resign."  Duffy
> v. Paper Magic Group, Inc., 265 F.3d 163, 167 (3d Cir. 2001) (internal quotations
> and citation omitted). Factors we have found relevant to this issue are whether the
> employer (1) "threatened [the employee] with discharge" or "urge[d] or
> suggest[ed] that she resign or retire," (2) "demote[d] her," (3) "reduce[d] her pay
> or benefits," (4) "involuntarily transferred [her] to a less desirable position," (5)
> altered her "job responsibilities," or (6) gave "unsatisfactory job evaluations."

Colwell v. Rite Aid Corp., 602 F.3d 495, 502-03 (3d Cir. 2010) (quoting Clowes v. Allegheny

Valley Hosp., 991 F.2d 1159, 1161 (3d Cir. 1993)).

Defendants argue that Plaintiff has not shown that Monumental permitted conditions so

unpleasant or difficult that a reasonable person would have felt compelled to resign.  In addition,

"a reasonable employee will usually explore such alternative avenues thoroughly before coming

to the conclusion that resignation is the only option."  Clowes, 991 F.2d at 1161 (footnote

omitted).  They argue that Plaintiff did not explore alternatives prior to resigning.

As explained above, however, Defendants have not drawn all inferences in Plaintiff's favor as the nonmoving party.  The evidence of record allows for the inferences that: 1) Plaintiff was threatened in April 2012 with immediate termination (not in keeping with Monumental's practices) if she did not meet a sales quota by August; 2) Plaintiff suffered a series of incidents in July and August 2012 in which Mamakos harassed her (and she knew that she was not going to receive any relief by complaining to Ehalt, who laughed at her); and 3) she did complain to a senior company official in March, who responded that he would "keep her on payroll" until she found another job.  In addition, as outlined above, there are genuine issues of material fact as to whether Monumental in fact took "appropriate action" in response to her internal complaint.   In summary, Defendants have not demonstrated that Monumental had in place an effective anti-harassment policy and that Plaintiff unreasonably failed to take advantage of it.  Therefore, with respect to her constructive discharge claims, the motion for summary judgment will be denied.

Retaliation Claims

Discrimination against an individual who has opposed a practice prohibited by Title VII or the PHRA or who has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under Title VII is itself actionable conduct.  A plaintiff may submit a claim for retaliation.  42 U.S.C. § 2000e-3(a); 43 P.S. § 955(d).

As summarized by the Court of Appeals for the Third Circuit, the prima facie case elements for a retaliation claim are as follows: 1) the plaintiff engaged in activity protected by the anti-discrimination statute; 2) the employer took action that a reasonable employee would have found to be materially adverse in that it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination; and 3) there is a causal connection

between the plaintiff's opposition to or participation in proceedings against unlawful discrimination and the employer's action. <u>Moore v. City of Philadelphia</u>, 461 F.3d 331, 341-42 (3d Cir. 2006). The Court of Appeals has explained that a plaintiff can substantiate a causal connection between the protected activity and an adverse employment action by: 1) showing that the temporal proximity is "unduly suggestive"; or 2) showing "inconsistencies in the defendant's testimony"; or 3) pointing to ongoing antagonism. <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 280-81 (3d Cir. 2000). The Supreme Court has recently clarified that, as to the third prong, a plaintiff making a retaliation claim under Title VII "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." <u>University of Tex. Sw. Med. Ctr. v. Nassar</u>, 133 S.Ct. 2517, 2534 (2013).

Defendants admit that Plaintiff's act of filing an internal complaint in February 2012 and a discrimination charge with the EEOC in June 2012 constitute protected activity. But they dispute that she suffered any adverse employment action, let alone one for which the but-for cause was the protected activity. However, the Supreme Court has rejected the position taken by the Third Circuit and others that an employee must point to an adverse employment action: "the anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 64 (2006).

Plaintiff points to the April 2, 2012 letter she received threatening to terminate her employment if she did not meet her Minimum Placement Standard for the year, Monumental's opposition to her unemployment compensation claim after she resigned and her inability to obtain employment as an insurance agent. Defendants argue that the first two incidents would have occurred regardless of whether she engaged in protected activity and that the third issue

was the result of her own actions. They contend that the April 2 letter was sent to all employees who had not met their quota as of that date; and that Monumental opposed her unemployment benefits claim on the lawful basis that she voluntarily resigned her employment.

However, Defendants have not drawn all inferences in Plaintiff's favor as the nonmoving party. She has argued that the letter (which as noted above, did not state that she "risked" termination but that she would be terminated for failing to meet a quota) was not in keeping with Monumental's practices. Moreover, as noted above, although Monumental insists that it was treating Plaintiff just like any other sales agent, the fact remains that she had been on medical leave for four and a half months and yet was being held to the same standard as the other employees who were at work for the entire year. Nevertheless, she met and exceeded her sales quota and was not terminated (facts which Monumental refuses to acknowledge).

With respect to her contention about Monumental opposing her application for unemployment benefits, Defendants again engage in paraphrasing. The actual statutory language is that an employee is ineligible for unemployment compensation for any week "[i]In which his unemployment is due to voluntarily leaving work without cause of a necessitous and compelling nature…" 43 P.S. § 802(b). The Pennsylvania Commonwealth Court has explained that:

> a determination that a claimant voluntarily quit is not an absolute bar to the recovery of unemployment compensation benefits. Monaco v. Unemployment Compensation Board of Review, 523 Pa. 41, 47, 565 A.2d 127, 130 (1989). A claimant may prove necessary and compelling reasons that could excuse the voluntary action of the claimant. Id. An employee seeking unemployment compensation after voluntarily terminating employment has the burden of proving cause of a necessitous and compelling nature for the voluntary quit. Fitzgerald v. Unemployment Compensation Board of Review, 714 A.2d 1126, 1129 (Pa. Cmwlth. 1998).

Brunswick Hotel & Conference Ctr., LLC v. Unemployment Compensation Bd. of Review, 906 A.2d 657, 660 (Pa. Commw. 2006). The examination of whether an employee had "cause of a

necessitous and compelling nature" to resign is similar to the inquiry of whether the employee was subjected to conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign.  As explained above, genuine issues of material fact preclude Defendants from obtaining summary judgment on Plaintiff's constructive discharge claim.  For the same reason, the Court cannot resolve whether Monumental's opposition to Plaintiff's application for unemployment benefits was justified on the ground that she resigned.

Defendants contend that the mere fact that an employer opposes a former employee's claim for unemployment benefits does not, in and of itself, establish a causal link between the employee's protected activity and this adverse employment action.  See Petrunich v. Sun Bldg. Sys., Inc., 2006 WL 2788208, at *8 (M.D. Pa. Sep. 26, 2006).  However, in this case, Plaintiff has pointed to ongoing antagonism from the time she filed her internal and EEOC complaints to the time Monumental opposed her application for unemployment compensation benefits.  The record is in dispute on this matter and it cannot be decided on a motion for summary judgment.

Finally, Plaintiff contends that Monumental interfered with her ability to obtain employment as an insurance agent.  The Supreme Court has held that Title VII's anti-retaliation provision includes retaliation against former employees.  Robinson v. Shell Oil Co., 519 U.S. 337 (1997).

Defendants argue that Plaintiff's own testimony establishes that she could not obtain employment with Lincoln Insurance because she no longer had a license to sell Monumental products once she resigned her employment with Monumental.  This argument is circular and does not aid the Court in resolving the issue.  On the other hand, Plaintiff cannot maintain a claim based upon the other position, which she states she did not pursue because she did not have a reliable vehicle.  Monumental had no part in that scenario.

Therefore, with respect to the retaliation claims, the motion for summary judgment will be denied.

Liability of Ehalt

Finally, Defendants argue that, although the PHRA extends liability to supervisors who aid and abet alleged discrimination, 43 P.S. § 955(e), there can be no individual liability in the absence of employer liability.  See Kern v. Schuylkill Intermediate Unit 29, 2010 WL 3632664, at *3 (M.D. Pa. Sep. 13, 2010); Reganick v. Southwestern Veterans' Ctr., 2008 WL768423, at *8 (W.D. Pa. Mar. 20, 2008).  However, for the reasons outlined above, genuine issues of material fact preclude Monumental from obtaining summary judgment in its favor.  And the record contains many incidents in which Ehalt "aided and abetted" the discrimination.  Therefore, with respect to all claims against Ehalt, the motion for summary judgment will be denied.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

TONYA CARSWELL,                          )
                    Plaintiff,           )
                                         )
        vs.                              )        Civil Action No. 13-378
                                         )
MONUMENTAL LIFE INSURANCE CO., et al.,   )
                    Defendants.          )

ORDER

AND NOW, this 9th day of July, 2014,

IT IS HEREBY ORDERED that the motion for summary judgment filed on behalf of the

Defendants, Monumental Life Insurance Company and Ronald Ehalt (ECF No. 39) is granted

with respect to Plaintiff's claims of sex and race discrimination and denied with respect to her

claims of hostile work environment, constructive discharge and retaliation and denied with

respect to the claims asserted against Ronald Ehalt.

s/Robert C. Mitchell
ROBERT C. MITCHELL
United States Magistrate Judge

cc:     Tonya Carswell
        306 East 12th Avenue
        Homestead, PA 15120